IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CHRISTOPHER B. MORRISON,
      Petitioner,

vs.                                    Case No. 5:08cv253/RS/EMT

WALTER A. McNEIL,
      Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1). Respondent filed an answer and relevant portions of the state court record (Doc. 18). Petitioner filed a reply (Doc. 22). Also before the court is Petitioner's motion to expand the record (Doc. 20) and motion to amend his habeas petition, with a proposed amended petition and a supporting memorandum of law (Docs. 26, 27, 28). Respondent filed responses opposing the motions (*see* Docs. 34, 35). Petitioner filed replies to Respondent's responses (Doc. 37, 38).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.       BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 18, Exhibits). Petitioner was indicted in the Circuit Court for Bay County, Florida, on one count of felony murder, with the underlying felony being aggravated child

abuse, which is a capital felony (Doc. 18, Ex. B at 9).  The victim was the three-year-old son of Petitioner's girlfriend.  Following a jury trial, Petitioner was found guilty as charged (Doc. 18, Ex. B at 64; Ex. C).  On October 11, 2002, Petitioner was sentenced to life imprisonment without the possibility of parole (Doc. 18, Ex. B at 71–75, 289–302).  Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA").  On June 3, 2004, the First DCA affirmed the judgment per curiam without written opinion (Doc. 18, Ex. H).  Morrison v. State, 877 So. 2d 726 (Fla. 1st DCA June 3, 2004) (Table).  On July 15, 2004 the court denied Petitioner's motion for rehearing (Doc. 18, Ex. I).  Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On March 25, 2005, Petitioner filed a petition for writ of habeas corpus alleging ineffective assistance of appellate counsel with the First DCA (Doc. 18, Ex. J).  On May 9, 2005, the First DCA denied the petition on the merits (Doc. 18, Ex. K).  Morrison v. State, 902 So. 2d 217 (Fla. 1st DCA 2005).

On May 20, 2005, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Doc. 18, Ex. L at 1–3).  The trial court denied the motion on June 27, 2005 (id. at 4).  Petitioner appealed the decision to the First DCA, and on October 25, 2005, the appellate court affirmed per curiam without written opinion (Doc. 18, Ex. N). Morrison v. State, 914 So. 2d 958 (Fla. 1st DCA Oct. 25, 2005) (Table).  The mandate issued November 22, 2005 (Doc. 18, Ex. O).

On November 10, 2005, Petitioner filed a second Rule 3.800(a) motion (Doc. 18, Ex. P at 1–3).  The trial court denied the motion on December 12, 2005 (id. at 4).  Petitioner appealed the decision to the First DCA, and on March 29, 2006, the appellate court affirmed per curiam without written opinion (Doc. 18, Ex. R).  Morrison v. State, 925 So. 2d 315 (Fla. 1st DCA Mar. 29, 2006) (Table).  The mandate issued April 26, 2006 (Doc. 18, Ex. S).

On February 21, 2006, while the appeal of Petitioner's Rule 3.800(a) motion was pending, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 18, Ex. T at 142–83).  The trial court summarily denied eleven of Petitioner's thirteen claims, ordered an evidentiary hearing on one claim, reserved judgement on one claim until after the evidentiary hearing, and appointed counsel for Petitioner (id. at 214–19).

Petitioner filed a pro se "addendum" to his motion, presenting an additional claim, and the court summarily denied the additional claim (*id.* at 225–29). Following the evidentiary hearing, the court denied Petitioner's remaining two claims (*id.* at 237–40, 265–318). Petitioner appealed the decision to the First DCA, raising only one issue on appeal (Doc. 18, Ex. U). On May 1, 2008, the appellate court affirmed the judgment per curiam without written opinion, with the mandate issuing May 19, 2008 (Doc. 18, Exs. X, Y). Morrison v. State, 980 So. 2d 494 (Fla. 1st DCA May 1, 2008) (Table).

Petitioner filed the instant habeas action on August 14, 2008, asserting the following grounds for relief:

Ground One: CONSTITUTIONAL VIOLATION OF PETITIONER'S RIGHT TO CONFLICT-FREE COUNSEL AS GUARANTEED BY THE UNITED STATES CONSTITUTION, THE 6TH AND 14TH AMENDMENTS AND MICKENS V. TAYLOR, 122 S. CT. 1237 (2002).

Ground Two: CONSTITUTIONAL VIOLATION OF PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL AS GUARANTEED BY 6TH AND 14TH AMENDMENT[S] OF THE UNITED STATES CONSTITUTION FOR APPELLATE COUNSEL'S FAILURE TO MASTER THE RECORD AND PROPERLY REVIEW TRIAL COUNSEL'S ARGUMENT BELOW, EVITTS V. LUCEY, 105 S. CT. 830 (1985).

Ground Three: CONSTITUTIONAL VIOLATION OF PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 6TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION FOR COUNSEL'S FAILURE TO (A) PROPERLY PREPARE FOR TRIAL; (B) DEVELOP A COHERENT THEORY OF DEFENSE; (C) DELIVERING HARMFUL CLOSING ARGUMENTS; AND (D) CUMULATIVE ERRORS. STRICKLAND V. WASHINGTON 466 U.S. 688 104 S. CT. 2052 (1984).

Ground Four: PETITIONER IS ACTUALLY INNOCENT OF THE CRIME OF FIRST DEGREE FELONY MURDER, MURRAY V. CARRIER, 477 U.S. 478 (1986), AND IS ENTITLED TO REVIEW OF HIS UNDERLYING JACKSON V. VIRGINIA, 443 U.S. 307 (1979) INSUFFICIENCY OF THE EVIDENCE CLAIM.

(Doc. 1).

In Respondent's response to the petition, Respondent asserted Petitioner failed to fairly present the federal nature of Ground One to the state courts and is now procedurally barred from doing so (Doc. 18 at 8–13, 17–18). As to Ground Two, Respondent conceded that Petitioner fairly presented his claim to the state courts but argued Petitioner is not entitled to habeas relief on the claim (*id.* at 13, 18–31). As to Ground Three, Respondent contended Petitioner failed to exhaust

the claim in the state courts because he failed to raise it on appeal of the trial court's denial of his Rule 3.850 motion; further, Petitioner is now procedurally barred from presenting the claim to the state courts (*id.* at 14, 31).  As to Ground Four, Respondent contended that to the extent Petitioner was raising a freestanding "actual innocence" claim, it was not cognizable on federal habeas (*id.* at 31). Further, to the extent Petitioner was raising an insufficiency of the evidence claim, Petitioner failed to exhaust the claim because he failed to present it to the state courts; further, Petitioner is now procedurally barred from doing so (*id.* at 14–15, 31).

Petitioner filed a reply to Respondent's response in which he acknowledged that, as to Ground Four, "actual innocence" is not cognizable as a freestanding ground for relief in federal habeas (Doc. 22 at 2).  Petitioner stated that he was asserting his actual innocence as a "gateway" to federal review of his unexhausted claims, namely, Grounds One and Three (*id.* at 2–8).  In support of his claim of innocence, Petitioner referred to "new evidence" that he discovered after trial, which he contends would have created reasonable doubt as to his guilt if presented to the jury (*id.*).  That evidence includes reports from the Florida Protective Services System involving the victim's mother, as well as the mother's mental health records from 1994, seven years prior to the child's death (*id.*). These documents are the subject of Petitioner's motion to expand the record (Doc. 20).

## II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v.</u>

---

[1] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous

application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.   EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[2] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it

---

[2]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
          (A)  the applicant has exhausted the remedies available in the courts of the State; or
          (B) (i)  there is an absence of available State corrective process; or
              (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." <u>Anderson</u>, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan v. Henry</u>, 513 U.S. 364. The <u>Duncan</u> Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." <u>Duncan</u>, 513 U.S. at 365–66. Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." <u>Baldwin v. Reese</u>, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The <u>Baldwin</u> Court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a

---

[3]The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32. With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[4]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* Coleman v. Thompson, 501 U.S. 722, 734-35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the

---

[4]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

state's procedural default doctrine. <u>Bailey</u>, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.*. A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* <u>Harris v. Reed</u>, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. <u>Lee v. Kemna</u>, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5] Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. <u>Tower</u>, 7 F.3d at 210. To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85,

---

[5]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. <u>Marek v. Singletary</u>, 62 F.3d 1295, 1302 (11th Cir. 1995); <u>Alderman v. Zant</u>, 22 F.3d 1541 (11th Cir. 1994).

130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id.* Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

IV.     PENDING MOTIONS

     A.     Motion to Expand the Record

     As previously noted, in Petitioner's motion to expand the record (Doc. 20), Petitioner seeks to add to the record reports from the Florida Protective Services System involving the victim's mother, as well as the mother's mental health records from 1994, seven years prior to the child's death. Petitioner contends these documents constitute "new evidence" that, if presented to the jury, would have created reasonable doubt as to his guilt. In light of Petitioner's contention that the documents demonstrate his actual innocence of the crime, thereby providing a gateway for this court to review his procedurally barred claims, the undersigned will grant Petitioner's motion to expand the record with the documents attached to his motion (Doc. 20). However, the court will instruct the clerk of court shall to seal the materials submitted as exhibits to the motion, pursuant to Rule 5.2(d) of the Federal Rules of Civil Procedure.[6]

     B.     Motion to Amend

     In Petitioner's motion to amend and proposed amended petition (Docs. 26, 27), Petitioner seeks to raise the same claims raised in his original petition, except he seeks to replace the actual innocence/insufficiency of the evidence claim raised as Ground Four with a claim of ineffective assistance of counsel based upon trial counsel's failure to adequately investigate the medical evidence and present an expert witness at trial (*see* Doc. 1 at 20–21; Doc. 27 at 6; Doc. 28 at 7–23).

---

[6]The undersigned is aware that Rule 5.2(b) exempts pro se filings in a § 2254 action from the redaction requirement of the Rule; therefore, the court will not require Petitioner to file a redacted version of the materials. However, in the interest of protecting the identity and privacy of the children who are the subjects of the abuse reports, as well as the privacy of the mother of the children, who was herself a child when she received the mental health counseling documented in the materials submitted by Petitioner, good cause exists to seal the materials.

Petitioner acknowledges that the claim he wishes to add was not exhausted in the state courts and is now procedurally barred; and he further concedes that the one-year limitations period for filing his federal petition expired prior to filing his motion to amend, and the new claim does not "relate back" to any claims included in his original habeas petition (Doc. 26 at 2; Doc. 27 at 6; Doc. 28 at 2; Doc. 37 at 4). However, Petitioner contends he is entitled to review of the new claim through the "actual innocence" gateway for review of procedurally barred, including time-barred, claims (Doc. 26 at 2; Doc. 28 at 2–7; Doc. 37 at 3–4). In support of his actual innocence argument, Petitioner relies upon the materials submitted with his motion to expand the record.

Respondent opposes the motion to amend on the ground that the "actual innocence" gateway may provide an avenue for review of procedurally barred or successive claims, but it does not provide a method for avoiding the AEDPA's statutorily-created limitation period (Doc. 34). Respondent further argues that prior to this court's consideration of the "new evidence," Petitioner must present it to the state courts in light of the fact that Florida law provides a procedural mechanism for doing so (*id.*). Additionally, Respondent argues that the allegedly new evidence fails to satisfy the actual innocence standard set forth in <u>Schlup v. Delo</u>, 513 U.S. 298 (1995) and <u>House v. Bell</u>, 547 U.S. 518 (2006) (*id.*). Finally, Respondent opposes Petitioner's motion to expand the record because the evidence Petitioner seeks to add to the record does not relate to the sole exhausted claim presented in the original and proposed amended petitions, that is, the claim of ineffective assistance of appellate counsel asserted as Ground Two in the original petition and Ground Three in the proposed amended petition, nor was the evidence presented to the state courts; therefore, this court may not consider it in determining whether the state court decision was an unreasonable application of federal law (*see* Doc. 35).

At the time Petitioner filed his motion to amend, Respondent had already served its answer to the original petition.[7] Therefore, Petitioner may not amend his petition as a matter of course;

---

[7]Respondent served its answer on February 20, 2009, and Petitioner filed his first motion to amend on March 16, 2009 (Docs. 18, 23).

rather, he must obtain leave of court to do so. *See* Fed. R. Civ. P. 15(a)(1, 2).[8] Rule 15 provides that

the court should freely give leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).

Although leave to amend is generally freely given, Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct.

227, 9 L. Ed. 2d 222 (1962), it is by no means guaranteed. Addington v. Farmer's Elevator Mut.,

Ins. Co., 650 F.2d 663, 666 (5th Cir. 1981). "The function of Rule 15(a), which provides generally

for the amendment of pleadings, is to enable a party to assert matters that were overlooked or were

unknown at the time he interposed the original complaint or answer." 6 Wright, Miller & Kane,

Federal Practice and Procedure: Civil 2d § 1473. The trial court has considerable discretion when

deciding whether to grant or deny a motion for leave to amend. Addington, 650 F.2d at 666. "In

making this determination, a court should consider whether there has been undue delay in filing, bad

faith or dilatory motives, prejudice to the opposing parties, and the futility of the amendment."

Local 472, United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Indus. v.

Georgia Power Co., 684 F.2d 721, 724 (11th Cir. 1982); *see also* Foman, 371 U.S. at 182.

In the instant case, Petitioner admits that the ineffective assistance of counsel claim that he

seeks to add was not exhausted in the state courts (*see* Doc. 27 at 6; Doc. 28 at 2, 7). He further

concedes that an attempt to return to state court to present his claim in a second Rule 3.850 motion

would be procedurally barred as successive (*see* Doc. 37 at 4). However, he contends amendment

of the petition to include this ineffective assistance of counsel claim would not be futile because he

is entitled to federal review under the "fundamental miscarriage of justice" exception to the

procedural bar. In support of his position, Petitioner submits the materials attached to his motion

to expand the record, which he contends demonstrate his actual innocence of the underlying

aggravated child abuse felony (Doc. 20). These materials consist of sixty-four (64) pages of abuse

reports of the Florida Protective Service System, some of which are reports concerning the death of

---

[8]The Federal Rules of Civil Procedure are applicable to proceedings for habeas corpus, "to the extent that the practice in those proceedings . . . is not specified in a federal statute, the Rules Governing Section 2254 Cases, or the Rules Governing Section 2255 Cases; . . . and has previously conformed to the practice in civil actions." Fed. R. Civ. P. 81(a)(4). In addition, Rule 11 of the Rules Governing § 2254 Proceedings provides that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules." Thus, the court will apply a traditional Rule 15 analysis to Petitioner's request to amend. *See* Mayle v. Felix, 545 U.S. 644, 655, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005) (applying Rule 15 to requests to amend § 2254 petitions); Moore v. Balkcom, 716 F.2d 1511, 1526–27 (11th Cir. 1983).

C.K., the three-year-old victim in this case, and mental health records of the Ms. Matuzek, the victim's mother (*id.*, Exhibits). Petitioner argues that the materials demonstrate his actual innocence because they show that Ms. Matuzek had a history of neglecting her children, physically harming them, and exposing them to domestic violence and drugs (*id.* at 4–6). Petitioner contends the documents also demonstrate that Ms. Matuzek had a history of violent behavior, mental health problems, and alcohol abuse. Petitioner asserts this evidence demonstrates the impossibility of any involvement on his part in causing the child victim's injuries; and if the jury had heard this evidence, no reasonable juror would have attributed the injuries to Petitioner (*id.* at 6).

As previously discussed, to satisfy the miscarriage of justice exception, a habeas petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup, 513 U.S. at 327. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id.* Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* The Schlup Court went on to make several observations about this standard. With respect to the term "probably resulted," the Court clarified that, "[t]o establish the requisite probability, the petitioner must show that it is <u>more likely than not</u> that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327, 330 (emphasis added). With respect to the term "reasonable juror," the Court instructed: "It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.* at 329. Additionally, it is important to note in this regard that "actual innocence" means factual innocence, not mere legal insufficiency. *See* Bousley v. United States, 523 U.S. 614, 623–24, 118 S. Ct. 1604, 1611–12, 140 L. Ed. 2d 828 (1998) (citing Sawyer v. Whitley, 505 U.S. 333, 339, 112 S. Ct. 2514, 2518–19, 120 L. Ed. 2d 269 (1992)).

In assessing the adequacy of the petitioner's showing, the district court "is not bound by the rules of admissibility that would govern at trial." Schlup, 513 U.S. at 329. Instead, the court is allowed also to consider "the probative force of relevant evidence . . . 'including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" Id., 513 U.S. at 328 (quoting Friendly, Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)).

In the recent decision of House v. Bell, 547 U.S. 518, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006), the Court did not alter the standard set forth in Schlup.  It reiterated that standard, emphasized certain features of it, and evaluated the evidence developed in House's federal habeas proceeding under that standard.  The Court did note, as a preliminary matter, that the parties in that case did not dispute that House had presented new reliable evidence.  House, 547 U.S. at 537 ("There is no dispute in this case that House has presented some new reliable evidence; the State has conceded as much." (citations to record omitted)).  In addition, because the district court in House held an evidentiary hearing, a decision the State did not challenge, the Court cautioned that it had no occasion to elaborate on Schlup's observation that the court may consider how certain factors bear on the probable reliability of the petitioner's evidence.  House, 547 U.S. at 537.

In determining what, if any, effect Petitioner's "new evidence" would have had on the jury's decision, a review of the evidence admitted at trial is required.  Ms. Matuzek, the mother of the child victim, was the first witness to testify.  She testified that at the time of C.K.'s death, he had just turned three years old (Doc. 18, Ex. C at 45).  The other members of the household were Petitioner and the one-year-old son of Petitioner and Ms. Ms. Matuzek, Christopher Brian Morrison, whom they called "Tyler" (id. at 45–46).  She testified that on October 29, 2001, she was attending Gulf Coast college and had to be at school at 1:00 p.m. (id. at 47–48).  She testified that Petitioner was not employed at the time, so he watched the two children while she attended school (id.).  She testified that she and Petitioner were experiencing financial problems, which caused them to argue sometimes, and they had only one vehicle (id. at 47–48).  She also testified that she and Petitioner did not agree on some parenting issues, such as potty training C.K. (id. at 49–50).  Ms. Matuzek testified that C.K. was a healthy child with no medical problems (id. at 50).  She stated that the

evening before C.K.'s death, the family watched movies, and she put the children to bed around 9:30 or 10:00 p.m. (*id.* at 50–51).  She testified that the next morning, she awoke at approximately 9:00 a.m. and left the house to pay the electric bill because it was going to be disconnected (*id.* at 52).  She did not check on the children before she left (*id.*).  She returned home and "laid around in the living room" before she had to leave for school (*id.* at 53).  Ms. Matuzek testified that she did not see the children before she left for school because Petitioner was taking care of them, but she could hear the children playing and laughing in the bedroom they shared (*id.*).  She left for school at 12:20 or 12:30 p.m. (*id.* at 54).  She testified that no one else was at the home that morning (*id.* at 57).  Ms. Matuzek stated that shortly after she arrived at school, she received an emergency phone call from Bay Medical Center (*id.* at 58).  When she arrived at the hospital, Petitioner told her that the children were playing in the bedroom, and he heard a scream, so he went to the bedroom (*id.*).  She recalled that Petitioner told her that when he arrived at the bedroom, he saw C.K. lying on the floor and the one-year-old baby was on top of him (*id.*).  Petitioner also told her that it appeared that C.K. was having a seizure at one point (*id.*).  Petitioner told her he tried to do CPR on C.K. when he was at the neighbor's house waiting for the ambulance (*id.* at 59).  Ms. Matuzek testified that it was usual for C.K. to play on the bed, but he had never injured himself jumping off the bed (*id.* at 66–67).

On cross-examination, Ms. Matuzek testified that Petitioner did not show any signs of being upset or angry the morning of the 29th (*id.* at 74–76).  When she left for school, Petitioner was in the kitchen fixing apple turnovers (*id.*).  Ms. Matuzek testified that a few days prior to October 29, C.K. had an abrasion near one of his eyes, and Petitioner told her a button from one of C.K.'s shirts scraped his face when Petitioner was undressing him (*id.* at 77–79).  She testified that she did not notice any abrasion, cut, or bruise on C.K.'s other eye (*id.* at 79).

Lauren Brooks, Ms. Matuzek's teacher, testified that she saw Ms. Matuzek at the school on October 29, 2001, between 12:30 and 12:45 p.m. (*id.* at 161).  Ms. Matuzek's demeanor was normal (*id.* at 161).

Anthony Reynolds, Petitioner's neighbor, testified that on October 29, 2001, after noon, Petitioner banged on his door with C.K. in his arms (*id.* at 80–81).  Mr. Reynolds called 911 (*id.* at 81).  According to Mr. Reynolds, C.K. did not have a pulse, his pupils were dilated, his eyes were rolling back, his feet were swollen, and his breathing was shallow (*id.*).  Mr. Reynolds observed

Petitioner perform CPR on C.K. by blowing into the child's mouth, but not touching the child's chest (*id.* at 82). Mr. Reynolds then attempted CPR, at which he was certified, and unsuccessfully attempted to find a pulse (*id.* at 81–82). Mr. Reynolds characterized Petitioner's behavior as "different" because he was smoking a cigarette while the child was lying there, and when the paramedics arrived and told him to extinguish it, Petitioner went outside and smoked another cigarette (*id.* at 83–84).

Paramedics were dispatched at 12:32 p.m. and arrived at Mr. Reynolds's home at 12:42 p.m. (*id.* 104, 117). When paramedics arrived, police officers and firefighters were already present (*id.* at 104). C.K. was pale, flaccid, cold and wet (*id.* at 105–06). The child had two contusions on his abdomen and an abrasion by his right eye (*id.* at 114, 124). Petitioner told the paramedics that he was in the kitchen preparing food when he heard the smaller child cry out in the back bedroom (*id.* at 106, 118). When Petitioner went into the bedroom he found C.K. on the floor with the smaller child on top of him (*id.* at 106). The paramedics made numerous unsuccessful attempts to start an IV and were also unable to draw even a drop of blood from C.K.'s finger (*id.* at 107, 119). According to the paramedics, the child was completely flaccid one moment and then active and somewhat combative the next (*id.* at 107, 120). They did not attempt to perform CPR because, in their opinion, C.K. did not need it as he was breathing and had a pulse (*id.* at 108). The paramedics transported the child to Bay Medical Center, arriving there at 1:03 p.m. (*id.* at 109).

Dr. Appel was the emergency room physician who treated C.K. (*id.* at 164). He was informed that a child was arriving in critical condition and immediately worked on resuscitating the child (*id.* at 165). C.K. had stopped breathing and had to be intubated (*id.*). His heart rate had slowed which required the doctor to perform CPR (*id.*). Resuscitation drugs, Atropine and Epinephrine, were administered (*id.* at 166). After twenty or thirty minutes of treatment C.K. lost all vital signs (*id.* at 167). At 1:58 p.m. the child was pronounced dead (*id.* at 173). Dr. Appel noticed that C.K. had an abrasion over his right eye, some bruising over the left eye and eyelid, bruising behind the right ear, bruising over the upper stomach and upper abdominal area, bruising over the right thigh, and multiple bruises over the mid back and buttocks (*id.* at 167). The abrasion over the right eye appeared fresh, but the bruising over the left eye and upper abdomen appeared three to four days old (*id.* at 174). Due to the different stages of bruising, Dr. Appel suspected child

abuse (*id.* at 175). Dr. Appel testified that it would not be possible to know whether C.K. had skull fractures while he was treating the child (*id.* at 168).

At the hospital, Petitioner told Ms. Matuzek that the children were playing together in the bedroom when he heard the baby, Tyler, scream (*id.* at 58). When Petitioner went to the bedroom he saw C.K. laying on the floor, with the baby "over top of him" (*id.*). Petitioner stated that it appeared, at one point, that C.K. was having a seizure (*id.*). Petitioner told Ms. Matuzek that he attempted to perform CPR on C.K. (*id.* at 59).

While at the hospital, a police officer and Ms. Matuzek's mother both observed that Petitioner had a paper towel wrapped and taped around his right wrist or hand indicating an injury (*id.* at 144). However, the officer did not investigate further to determine whether Petitioner was, in fact, injured (*id.*).

Dr. Hunt Scheuerman, the medical examiner, performed an autopsy on the child. He testified as an expert in the field of forensic science (*id.* at 188). The doctor stated that C.K. had a small abrasion behind his right ear beneath which was a small depressed skull fracture (*id.* at 193). He also had a large fracture of the occipital bone, which is at the back of the head, but no bruising outside or beneath the scalp (*id.* at 194). Additionally, the child's liver was transected such that it was essentially split into two lobes (*id.* at 209). As a result of the injury to the liver, between thirty-five and forty percent of the child's blood pooled into his abdominal cavity, which could have resulted in severe shock (*id.* at 212). The doctor opined that the skull fracture on the back of the skull was consistent with the child's head being slammed against a padded, flat surface, like a carpeted floor (*id.* at 197). He further opined that the liver laceration was caused by a minimum of three blows or impacts to that area (*id.* at 217). Dr. Scheuerman testified that he did not see evidence of past bone fractures or injuries to joints that are common in cases of suspected child abuse (*id.* at 222–23). He also testified that even if the child, at his height of forty inches, jumped fourteen inches into the air, on a bed that is eighteen inches high before falling and hitting his head on a padded surface like a carpet, it would be unusual for an injury such as the fracture at the back of C.K.'s skull to result (*id.* at 225). Dr. Scheuerman also stated that he had seen cases where attempts at CPR resulted in small lacerations of the liver, although more commonly in adults than children (*id.* at 237–38). The doctor had never seen a liver split in half as a result of improperly

performed CPR (*id.* at 210). Dr. Scheuerman testified that the small fracture at the back of the right ear would not have, alone, caused C.K.'s death (*id.* at 215). However, either the large fracture at the back of the skull or the lacerated liver could have resulted in the death of the child (*id.*). Since they appeared to have occurred at around the same time, the doctor could not determine which resulted in C.K.'s death (*id.* at 216). The manner of death was determined to be a homicide (*id.* at 217).

The State called Dr. Osborne as an expert in the field of general surgery and particularly in trauma to the internal organs of the liver (*id.* at 246). Dr. Osborne testified that C.K.'s liver sustained a major laceration, essentially splitting the liver in two parts (*id.* at 247). He opined that it was very unlikely that improperly performed CPR resulted in the laceration to C.K.'s liver, especially in light of the site of the laceration (*id.* at 251). Dr. Osborne testified that it was reasonable that one single blow, rather than repeated chest compressions, caused the liver laceration (*id.* at 262).

The State presented evidence of various potential motives for the killing. In one scenario, Ms. Matuzek testified that C.K.'s biological father had written a letter informing her that he was being released from prison and that he was going to take C.K. away (*id.* at 55). Ms. Matuzek described Petitioner's reaction to that letter as "uncomfortable" and that he "[d]idn't really agree with that" (*id.* at 55–56). In response, Ms. Matuzek and Petitioner wrote a letter to C.K.'s father, which was admitted into evidence as state's exhibit 1F[9] (*id.* at 136). In the letter, Ms. Matuzek and Petitioner expressed their opinion that Petitioner was raising C.K. and teaching him as a father would and that they did not believe Mr. Matuzek should interfere (*id.*).

A second possible motive for the killing was that, at three years old, C.K. was not yet potty trained (*id.* at 77). According to Ms. Matuzek, Petitioner expressed that he thought C.K. should be potty trained, and on occasion Petitioner would leave C.K. on the potty for great lengths of time (*id.*). However, the evidence showed that on the day C.K. died, his diaper was filled with urine, but unsoiled by feces (*id.* at 115, 119).

---

[9]Drafts of the letter were found in the garbage at Ms. Matuzek's home (*id.* at 136). They were admitted into evidence as state's exhibits 1A through 1E (*id.*).

The State introduced a blood stained pillow case that was recovered on the couch in the living room, a blood stained pad that was recovered between the mattresses in the children's room, and a blood stained shirt that was found in the living room (*id.* at 139, 142). A picture of an open bottle of hydrogen peroxide found in the kitchen was also introduced (*id.* at 150).

The State also introduced evidence describing the scene of the incident. The home was in a state of disarray, which Ms. Matuzek testified was its common state (*id.* at 68). In the children's bedroom, there was a bicycle next to C.K.'s bed (*id.* at 66). C.K.'s bed was eighteen inches from the top of the mattress to the floor (*id.* at 147). The floor in the children's room was carpeted. Beneath the carpeting was tile (*id.*). The bedroom walls were sheetrock and the doors were hollow wooden doors. All the tables in the room were upright (*id.*). A television set had fallen back against the wall, away from the bed (*id.* at 147–48). An electric heater, which was on and operating, was in the room (*id.* at 148). A number of the doors in the home were missing their doorknobs, leaving sharp metal spikes protruding (*id.* at 148, 155). A picture in the hallway appeared to have fallen from the wall and was lying on the floor (*id.* at 149). There did not appear to be any sign of forced entry into the home (*id.* at 147).

Within this context, the court will consider Petitioner's "new evidence" of his factual innocence, specifically, reports from the Florida Protective Services System and Ms. Matuzek's mental health records. The protective services reports concerning C.K.'s death , that is, abuse reports 2001-174906, 2001-175647, 2001-175650, and 2001-176058, do not include any information that would have been helpful to the defense (Doc. 20, Exs. 1–12, 13–15). Abuse report 2001-174904 shows the following information was reported to the protective services agency: the victim died on October 29, 2001 after 1:00 p.m.; Petitioner called 911 at 12:40 p.m. to report that the child was having difficulty breathing; the child was rushed to the hospital, where it was discovered that the child had bruises "from head to toe" and lacerations behind his right ear and on the right side of his mouth; the mother was not at home at the time; when questioned by hospital staff, Petitioner stated the child must have fallen off the bed, however, the injuries were not consistent with this story; Petitioner stated he administered CPR to the child; when Petitioner was questioned by police, he left the hospital, and his whereabouts are unknown (*id.* at 5–12). Abuse report 2001-175647 shows the following information was reported to the agency: on October 30, 2001, Petitioner hit

the child, and the child died from the blow; the cause of the child's death was "trauma to the head"; Petitioner hit the child in the past (*id.* at 1, 4). Abuse report 2001-175650 does not include any additional information (*id.* at 2–3). Abuse report 2001-176058 shows the following information was reported to the agency: on October 29, 2001, C.K. suffered multiple bruises to his head and torso, which resulted in his death; the injuries are consistent with blunt trauma; it is unknown how he suffered the injuries; Ms. Matuzek was not home at the time the child suffered the injuries; Petitioner was looking after the child at the time; several stories about what happened have surfaced; one story was that the child fell off the bed, and the other was that he fell getting into or out of the bathtub (*id.* at 13–15). None of the information included in the 2001 reports suggests that Ms. Matuzek caused C.K.'s injuries, nor do the reports suggest Petitioner did not cause the injuries from which the child died; therefore, these reports offer nothing to support Petitioner's actual innocence claim.

The protective services reports concerning Ms. Matuzek's involvement with protective services from 1996 to 2000, prior to C.K.'s death, as well as Ms. Matuzek's mental health records, are also unsupportive of Petitioner actual innocence claim. Only two reports allege violent behavior by Ms. Matuzek, abuse report 1996-090104 and 1996-090105, and both of those reports concern the same incident involving a physical altercation between Ms. Matuzek, who was then sixteen years old, and her mother (*see* Doc. 20, Exs. 47–49, 51–56). The reports indicate that in 1996, five years prior to the C.K.'s death, Ms. Matuzek became angry with her mother and began "beating" her (*id.* at 51, 53). Ms. Matuzek's father then began "hitting and choking" her (Ms. Matuzek) (*id.*). According to the reports, Ms. Matuzek ran to a neighbor's house, and her father followed (*id.* at 51). The neighbor held Ms. Matuzek's father at gunpoint to keep him from continuing to hit her (*id.*). The police were called, and they recommended that Ms. Matuzek's father leave the home for the night (*id.*). Ms. Matuzek's one-year-old daughter was present during the altercation (*id.* at 56). Upon being interviewed by the protective services investigator, Ms. Matuzek and her parents admitted that they were having difficulty "getting along" (*id.* at 49, 55–56). The investigator found some evidence of physical injury and domestic violence but determined that responsibility for the altercation did not lie with a particular family member (*id.* at 49, 56).

The remaining reports cover the period June of 1996, when Ms. Matuzek was sixteen years old, to December of 1999, show that on three occasions investigators found some indications that

Ms. Matuzek abused alcohol and failed to adequately supervise her children (*id.* at 28–31, 37–42, 57–61, abuse reports 1996-069322, 1996-121910, and 1999-165792), although the basis for the most recent finding in the 1999 report was Ms. Matuzek's history and her voluntarily submitting to a substance abuse evaluation, which apparently resulted in a recommendation that she have "some education in substance abuse" (*id.* at 30). Additionally, one of these reports, abuse report 1996-069322, which was the first protective services report involving Ms. Matuzek's family, and the medical records submitted by Petitioner show that Ms. Matuzek received mental health treatment when she was a teenager (*id.* at 60–64). None of these documents indicates that Ms. Matuzek ever physically abused, or was accused of physically abusing, her children. Furthermore, none of them include facts from which a factfinder could reasonably infer that Ms. Matuzek was involved in inflicting any physical injury upon C.K. in October of 2001.[10] Therefore, Petitioner has failed to show that the documents are sufficient to make a colorable showing of actual innocence.

Additionally, although Petitioner suggests the abuse reports and mental health records had impeachment value in that they discredit Ms. Matuzek's testimony, he has failed to show that Ms. Matuzek's testimony was inconsistent with any information in the reports; indeed, upon comparing Ms. Matuzek's trial testimony with the information in the reports, the undersigned does not find any inconsistencies. Furthermore, the records do not otherwise impugn the reliability or veracity of Ms. Matuzek's testimony. Although the protective services reports show that investigators found indicators that Ms. Matuzek abused alcohol, inadequately supervised her children, and received mental health treatment on several occasions over the five-year period from 1994 to 1999, the reports contain no evidence that in the days before C.K.'s death on October 29, 2001, Ms. Matuzek

---

[10]Indeed, some of the reports are harmful to the defense as they suggest that Petitioner previously engaged in violent behavior in the home. Abuse report 2000-103741 concerned allegations that Ms. Matuzek was selling drugs from the home, throwing all-night parties, and using cocaine and alcohol (Doc. 20, Exhibits at 23). The report also alleged that Petitioner yelled at and shoved C.K. because he did not like C.K.'s father and "takes it out on [C.K.]" (*id.*). According to the report, the investigator did not observe any bruises or marks on C.K. and found no indicators of physical abuse (*id.* at 26–27). However, the investigator found some indicators that the child had been exposed to alcohol and drugs based upon the report of C.K.'s older sibling that Petitioner consumed alcohol and smoked marijuana around them (*id.*). Abuse report 2001-130166 concerned allegations that Petitioner fought with Ms. Matuzek, was "mean" to C.K.'s older sibling, yelled a lot, and "scares people with knives" (*id.* at 17). According to the report, the investigator observed that the children in the home, including C.K., appeared to be "happy and healthy," and there were no indications of physical injury (*id.*). However, the investigator found some indicators of family violence, "other mental injury" and "deadly weapon injury" (*id.*).

was under the influence of alcohol or suffering from a mental condition such that the reliability or truthfulness of her testimony concerning the events surrounding his death was subject to doubt. Therefore, Petitioner has failed to show that the new evidence had any impeachment value.

To put this case into perspective, the undersigned offers a comparison of the evidence Petitioner has proffered with that adduced in Schlup and House. In Schlup a white prisoner, Schlup, was convicted of murdering a fellow inmate, Arthur Dade, who was black. The State's evidence consisted primarily of the testimony of two corrections officers who had witnessed the killing. As summarized by the United State Supreme Court:

> On the day of the murder, Sergeant Roger Flowers was on duty on Walk 1 and Walk 2, the two walks on the lower floor of the prison's high security area. Flowers testified that he first released the inmates on Walk 2 for their noon meal and relocked their cells. After unlocking the cells to release the inmates on Walk 1, Flowers noticed an inmate named Rodnie Stewart moving against the flow of traffic carrying a container of steaming liquid. Flowers watched as Stewart threw the liquid in Dade's face. According to Flowers, Schlup then jumped on Dade's back, and Robert O'Neal joined in the attack. Flowers shouted for help, entered the walk, and grabbed Stewart as the two other assailants fled.
>
> Officer John Maylee witnessed the attack from Walk 7, which is three levels and some 40-50 feet above Walks 1 and 2. Maylee first noticed Schlup, Stewart, and O'Neal as they were running from Walk 2 to Walk 1 against the flow of traffic. According to Maylee's testimony, Stewart threw a container of liquid at Dade's face, and then Schlup jumped on Dade's back. O'Neal then stabbed Dade several times in the chest, ran down the walk, and threw the weapon out a window. Maylee did not see what happened to Schlup or Stewart after the stabbing.
>
> The State produced no physical evidence connecting Schlup to the killing, and no witness other than Flowers and Maylee testified to Schlup's involvement in the murder.
>
> Schlup's defense was that the State had the wrong man.

Schlup, 513 U.S. at 302–03 (footnotes omitted).

Schlup's proof of actual innocence came from (1) a videotape that showed him to be in the prison dining room when the murder took place some distance away, (2) the statement of a prison clerk who corroborated the time that the alarm sounded (in relation to the time Schlup entered the dining room) when there was no reason for the clerk to know that the timing made a critical

difference, (3) an affidavit from a prison lieutenant who observed Schlup for over two minutes as he walked to the dining room, and who stated that Schlup was not hurrying, perspiring, or breathing hard, which would have been the case had he gone from the murder scene in time to arrive in the dining room when the videotape placed him there, and (4) affidavits from black inmates attesting to the innocence of a white defendant in a racially motivated killing. The <u>Schlup</u> Court concluded that the habeas court should consider this evidence to determine whether the new facts "raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without assurance that the trial was untainted by constitutional error." 115 S. Ct. at 317.

In <u>House</u>, Paul House was convicted of murdering Mrs. Muncey. The evidence supporting the conviction included: (1) testimony from Mrs. Muncey's children that late at night they overheard their mother talking to someone with a deep voice, like House (but also like their grandfather), telling her that Mr. Muncey had been involved in an accident; (2) Mr. Muncey came home soon thereafter, and asked where Mrs. Muncey was; (3) the next afternoon a Mr. Hensley saw House near an embankment in the Muncey's neighborhood, wiping his hands with a black rag, and House told Mr. Hensley that he had heard that Mrs. Muncey was missing and that he was looking for Mr. Muncey; (4) Mr. Hensley later came back and found Mrs. Muncey's body down the embankment near where he had seen House, and near where House's car had been parked; (5) the autopsy showed that Mrs. Muncey had been killed by being struck in the head; (6) House was interviewed by law enforcement and lied about his whereabouts on the night in question, and had scratches on his hands and arms; (7) law enforcement later seized the pants House was wearing on the night of the murder, which were "heavily soiled" with "reddish brown stains;" (8) House's pants, blood samples from Mrs. Muncey's autopsy and other evidence were packed in a box and taken to the FBI lab in Washington, D.C.; (9) there was human blood on the pants which was not House's blood; and (10) there was semen in Mrs. Muncey's panties that could have been from House.

During House's federal habeas proceeding, he presented the following exculpatory evidence: (1) DNA testing establishing that the semen in Mrs. Muncey's panties came from her husband, not House; (2) testimonial and physical evidence of "evidentiary disarray" surrounding the State's blood evidence which would prevent reasonable jurors from placing significant reliance on the blood evidence; and (3) testimonial evidence that Mr. Muncey admitted to several people that he had killed

his wife, claiming that it was an accident. The Court found that although it was a close question, House had satisfied the gateway standard set out in <u>Schlup</u>, and that the lower court could disregard the procedural default and review the case on its merits. 126 S. Ct. at 2087.

The evidence proffered by Petitioner in the instant case comes nowhere near the evidence produced in <u>Schlup</u> and <u>House</u>, *supra*. Petitioner's "new evidence" is not in the nature of exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence suggesting he was not the person who inflicted the fatal injuries on C.K.. Furthermore, considering Petitioner's "new evidence" with the evidence that was submitted to the jury at trial, Petitioner has failed to show that it is <u>more likely than not</u> that no reasonable juror would have convicted him if the new evidence had been presented at trial. Therefore, Petitioner may not obtain federal review of the new, admittedly unexhausted and procedurally barred ineffective assistance of counsel claim proposed in his amended petition. Accordingly, amendment of the petition would be futile.

Futility of the amendment is also demonstrated by the lack of a meritorious basis for the new claim of ineffective assistance of counsel. In the new claim, Petitioner contends his trial counsel performed ineffectively by failing to adequately investigate the State's medical evidence and present a medical expert at trial (Doc. 27 at 6; Doc. 28 at 7–23). He also appears to claim that counsel failed to investigate Ms. Matuzek's history of "violent behavior" and "gross negligence" of her children, as documented by the protective services reports discussed *supra* (Doc. 27 at 6; Doc. 28 at 7, 9, 21–22).

With regard to counsel's failure to investigate the medical evidence and present testimony from a medical expert, Petitioner has not demonstrated that counsel's performance in this regard was deficient. Although Petitioner asserts that a forensic pathologist would have testified that the medical evidence supported the theory that C.K.'s death resulted from a fall or could have been caused by Ms. Matuzek before she left the house (*see* Doc. 28 at 6–7, 21), and an expert would have rebutted and impeached the testimony of the State's medical experts (*id.* at 9–22), Petitioner provides no factual support for his assertions as to the content of a defense expert's testimony. Petitioner proffers various medical propositions from medical journals and cites expert testimony from other criminal cases (*id.* at 6–7, 10–22), but he has proffered no evidence of how a defense expert would have testified concerning the facts of this particular case. Petitioner's assertion that

a medical expert would have provided testimony to rebut and impeach the State's experts is speculative and completely devoid of factual support. As Petitioner has not shown that counsel's further investigation into medical evidence would have produced evidence favorable to the defense, he has failed to establish that counsel's failure to investigate and present testimony from a defense expert was unreasonable or that there is a reasonable probability he would have been acquitted of the felony murder charge if counsel had presented expert medical testimony.

Additionally, Petitioner has failed to demonstrate he was prejudiced by counsel's failure to investigate or present evidence of Ms. Matuzek's involvement with the Florida child protection agency or her mental health history. Petitioner asserts that the protective services documents show (1) that Ms. Matuzek engaged in violent behavior and abused and neglected her children, and (2) that her children showed signs of physical abuse while in her care (Doc. 28 at 4–6). Petitioner contends if the jury had heard this evidence, the jury could not have eliminated her as the perpetrator, and he would have been acquitted pursuant to Florida's circumstantial evidence rule (Doc. 28 at 4–22).[11] As previously discussed, none of the protective services reports from 2001 concerning C.K.'s death include any information that would have been helpful to the defense (Doc. 20, Exs. 1–15). Additionally, none of the records concerning Ms. Matuzek's involvement with the agency prior to 2001 suggest that Ms. Matuzek ever physically abused any of her children. Furthermore, evidence that the agency found some indicators of alcohol abuse, inadequate supervision, and mental health problems from 1994 to 1999 is not evidence from which the jury could reasonably infer that Ms. Matuzek inflicted the injuries which caused C.K.'s death in 2001. Moreover, as previously discussed, the protective services reports had no impeachment value to the defense. Therefore, Petitioner has failed to establish that defense counsel's failure to investigate and present evidence of Ms. Matuzek's mental health history and her history with the protective services agency was unreasonable, or that there is a reasonable probability that Petitioner would have been acquitted if counsel had investigated and presented this evidence. In light of this determination that Petitioner's new claim fails to present a meritorious basis for habeas relief, amendment of the

---

[11]In Florida, in cases where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. State v. Law, 559 So. 2d 187, 188 (Fla. 1989).

petition to add the claim would be futile. Accordingly, Petitioner's motion to amend should be denied.

The undersigned will now undertake review of the claims raised in the original habeas petition (Doc. 1).

V.      PETITIONER'S CLAIMS

A.      Ground One:  CONSTITUTIONAL VIOLATION OF PETITIONER'S RIGHT TO CONFLICT-FREE COUNSEL AS GUARANTEED BY THE UNITED STATES CONSTITUTION, THE 6TH AND 14TH AMENDMENTS AND MICKENS V. TAYLOR,122 S. CT. 1237 (2002).

B.      Ground Three:  CONSTITUTIONAL VIOLATION OF PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 6TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION FOR COUNSEL'S FAILURE TO (A) PROPERLY PREPARE FOR TRIAL; (B) DEVELOP A COHERENT THEORY OF DEFENSE; (C) DELIVERING HARMFUL CLOSING ARGUMENTS; AND (D) CUMULATIVE ERRORS.  STRICKLAND V. WASHINGTON 466 U.S. 688 104 S. CT. 2052 (1984).

In Ground One, Petitioner claims that the trial court violated his Sixth Amendment right to effective assistance of counsel by failing to conduct an inquiry into the reasons for Petitioner's request that his court-appointed counsel be discharged, which Petitioner contends resulted in his proceeding with counsel who had an actual conflict of interest, in violation of the constitutional principles set forth in Mickens v. Taylor, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) (Doc. 1 at 6–9).[12]  In Ground Three, Petitioner claims that he received ineffective assistance of counsel based upon (1) counsel's failure to properly prepare for trial, (2) counsel's failure to develop a coherent theory of defense, (3) counsel's making statements during closing argument that were harmful to the defense, and (4) the cumulative effect of counsel's errors (id. at 12–20).

Petitioner concedes that Grounds One and Three of his original petition (renumbered as Grounds Two and Four in his proposed amended petition) were not properly exhausted in the state courts and are now procedurally barred (see Doc. 22 at 2; Doc. 28 at 2, 23).  However, he contends that his new evidence of Ms. Matuzek's involvement with the state protective services agency and her mental health history provide a gateway through which his claims may be federally reviewed

---

[12]In Mickens, the Supreme Court held that to demonstrate a Sixth Amendment violation based upon the trial court's failure to inquire into a potential conflict of interest about which it knew or reasonably should have known, the defendant must establish that this conflict of interest adversely affected counsel's performance.  535 U.S. at 173–74.

because this evidence shows he is actually innocent of inflicting the fatal injuries on C.K. (*see* Doc. 22 at 2–8). As previously discussed, Petitioner has failed to make a colorable showing of actual innocence; therefore, he is not entitled to federal review of his procedurally barred claims through the "fundamental miscarriage of justice" exception to the procedural bar. Accordingly, he is not entitled to federal habeas relief on Grounds One and Three.

C. Ground Two: CONSTITUTIONAL VIOLATION OF PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL AS GUARANTEED BY 6TH AND 14TH AMENDMENT[S] OF THE UNITED STATES CONSTITUTION FOR APPELLATE COUNSEL'S FAILURE TO MASTER THE RECORD AND PROPERLY REVIEW TRIAL COUNSEL'S ARGUMENT BELOW, EVITTS V. LUCEY, 105 S. CT. 830 (1985).

Petitioner contends his appellate counsel performed ineffectively on direct appeal of his conviction by failing to raise an ex post facto claim with regard to one of the jury instructions given at trial, specifically, the instruction on aggravated child abuse (Doc. 1 at 9–12). Petitioner contends the instruction given at his trial was approved by the Florida Supreme Court just two months prior. This new instruction stated that to prove the crime of aggravated child abuse, the State must prove the following two elements: (1) Petitioner knowingly or willfully committed child abuse upon C.K. and in doing so caused great bodily harm, and (2) C.K. was under the age of 18 (*id.* at 10). However, the instruction in effect at the time of Petitioner's offense, October of 2001, stated the State must prove the following three elements: (1) Petitioner committed a battery against C.K. by intentionally touching or striking him against his will; (2) Petitioner committed the battery intentionally or knowingly causing C.K. great bodily harm; and (3) C.K. was under the age of 18 (*id.*). Petitioner contends the use of the new instruction violated the Ex Post Facto clause because it lessened the State's burden of proof by reducing the elements to two instead of three after Petitioner's offense date (*id.*). He further contends the issue was properly preserved by his trial counsel (*id.* at 10–11).

Respondent concedes that Petitioner exhausted this claim in the state courts by raising it in his state habeas petition alleging ineffective assistance of appellate counsel (Doc. 18 at 18). Respondent further concedes that the jury was instructed according to the 2002 instruction on aggravated child abuse (*id.* at 26). Respondent contends, however, that the new instruction did not eliminate an element of the crime (*id.* at 18–27). Therefore, counsel's failure to raise the issue on

appeal was not deficient performance; and Petitioner was not prejudiced by counsel's failure to raise it on appeal (*id.* at 18–30).

      1.      Clearly Established Supreme Court Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is the same standard for evaluating trial counsel's performance set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See* Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citing Smith v. Murray, 477 U.S. 527, 535–36, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986) (applying Strickland to claim of attorney error on appeal)). The habeas petitioner must first show that his counsel was objectively unreasonable in failing to raise a particular issue on appeal. Strickland, 466 U.S. at 687–91. Where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits. Atkins v. Singletary, 965 F.2d 952, 957 (11th Cir. 1992); Francois v. Wainwright, 741 F.2d 1275, 1285–86 (11th Cir. 1984). Additionally, appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)). If the petitioner succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to raise the issue, he would have prevailed on his appeal. *Id.* at 286 (citing Strickland, 466 U.S. at 694 (defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different")); Nyhuis, 211 F.3d at 1344 (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)). As the Eleventh Circuit noted in Johnson v. Alabama, 256 F.3d 1156 (11th Cir. 2001), "It is difficult to win a Strickland claim on the grounds that appellate counsel pressed the wrong legal arguments where the arguments actually pursued were reasonable in the circumstances." *Id.* at 1188. The Eleventh Circuit emphasized that even in a death penalty case, counsel must be "highly selective about the issues to be argued on appeal . . . ." *Id.* (citation omitted).

      2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Three in his state habeas petition (Doc. 18, Ex. J at 3, 7–9). The First DCA issued an opinion stating that the petition was denied on the merits (Doc. 18, Ex. K). Although the state court's denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be contrary to or an unreasonable application of clearly established federal law. *See* Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255–56 (11th Cir. 2002) (holding that a state court decision that does not rest on procedural grounds alone is an adjudication on the merits and, therefore, entitled to deference under the AEDPA, even if the state court decision is not explained in a written opinion, and reviewing state court's rejection of claim to determine whether it was unreasonable application of clearly established federal law).

Initially, it does not appear that Petitioner's trial counsel properly preserved the issue that Petitioner claims his appellate counsel should have raised, that is, that the jury instruction on aggravated child abuse improperly omitted an element of the offense. To properly preserve the issue for appeal, trial counsel was required to object to the instruction at the time of the charge conference or following the court's instruction to the jury. *See* Fla. R. Crim. P. 3.390(d); State v. Delva, 575 So. 2d 643, 644 (Fla. 1991); Lain v. State, 2 So. 3d 1090, 1092 (Fla. 5th DCA 2009). The only objection raised by Petitioner's trial counsel was the omission of an additional instruction on third degree felony child abuse (Doc. 18, Ex. C at 284–88, 369). Counsel did not object to the instruction on aggravated child abuse, which stated as follows:

> To prove the crime of aggravated chid abuse the state must prove the following two elements beyond a reasonable doubt. First, Christopher Brian Morrison knowingly or willfully committed child abuse upon [C.K.] and in so doing caused great bodily harm, permanent disability or permanent disfigurement. And, second, [C.K.] was under the age of 18 years.

> "Willfully" means knowing, intentionally and purposely.

> Child abuse means the intentional infliction of physical or mental injury upon a child or an intentional act that could reasonably be expected to result in physical or mental injury to a child.

(Doc. 17, Ex. C at 360). In light of trial counsel's failure to preserve the issue that Petitioner claims his appellate counsel should have raised, appellate counsel's failure to raise the issue was not unreasonable. *See* Atkins, 965 F.2d at 957.

Additionally, even if trial counsel had properly preserved the issue, Petitioner's claim is reasonably considered to be without merit. Prior to 1996, Section 827.03 defined aggravated child abuse in four ways: (1) committing aggravated battery on a child, (2) willfully torturing a child, (3) maliciously punishing a child, or (4) willfully and unlawfully caging a child (Doc. 18, Ex. BB). *See* Fla. Stat. § 827.03 (1995). The Florida standard jury instructions provided two different instructions based upon the theory of aggravated child abuse under which the State proceeded; one instruction dealt with the aggravated battery theory and the other dealt with the torture, malicious punishment, and caged theories (Doc. 18, Ex. CC).

When the child abuse statute was amended in 1996, a fifth theory of aggravated child abuse was added, that is, "[k]nowingly or willfully abus[ing] a child and in so doing caus[ing] great bodily harm, permanent disability, or permanent disfigurement to the child." (Doc. 18, Ex. Z). *See* Fla. Stat. 827.03 (1999).[13] Under this fifth theory, the State had to prove that the defendant intentionally

---

[13]The statute provided, in relevant part:

**827.03. Abuse, aggravated abuse, and neglect of a child; penalties**

(1) "Child abuse" means:

(a) Intentional infliction of physical or mental injury upon a child;

(b) An intentional act that could reasonably be expected to result in physical or mental injury to a child; or

(c) Active encouragement of any person to commit an act that results or could reasonably be expected to result in physical or mental injury to a child.

A person who knowingly or willfully abuses a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2) "Aggravated child abuse" occurs when a person:

(a) Commits aggravated battery on a child;

(b) Willfully tortures, maliciously punishes, or willfully and unlawfully cages a child; or

inflicted physical injury upon the child victim or intentionally engaged in an act that could reasonably be expected to result in physical injury to the child, and in doing so, caused great bodily harm. The trial court's instruction on aggravated child abuse, set forth *supra*, was a correct statement of the elements of aggravated child abuse on the theory set forth in section 2(c) of the statute, including the intent element. The fact that the Florida standard jury instructions on aggravated child abuse were not updated to reflect the fifth theory of aggravated child abuse until just two months prior to Petitioner's trial, *see* Standard Jury Instructions In Criminal Cases—Submission 2001-1, 824 So. 2d 881 (Fla. 2002), and the trial court used the updated instruction, does not constitute an ex post facto violation where, as here, the updated instruction accurately reflected the aggravated child abuse statute that existed since 1996 and did not alter the elements of the crime, including the intent element. In light of this conclusion that Petitioner's ex post facto claim is reasonably considered to be without merit, appellate counsel's failure to raise the issue on appeal was not deficient performance. Therefore, Petitioner has failed to demonstrate that the First DCA's denial of this ineffective assistance of appellate counsel claim was contrary to or an unreasonable application of clearly established federal law.

       D.    Ground Four: PETITIONER IS ACTUALLY INNOCENT OF THE CRIME OF FIRST DEGREE FELONY MURDER, MURRAY V. CARRIER, 477 U.S. 478 (1986), AND IS ENTITLED TO REVIEW OF HIS UNDERLYING JACKSON V. VIRGINIA, 443 U.S. 307 (1979) INSUFFICIENCY OF THE EVIDENCE CLAIM.

Petitioner acknowledges in his reply brief that he did not intend this claim as a freestanding actual innocence claim but to provide a gateway through which he could obtain federal review of Grounds One and Three, his procedurally barred claims (Doc. 22 at 2–8). As previously discussed, Petitioner has not made a threshold showing of actual innocence to avoid the procedural bar to federal review of his claims. Therefore, he is not entitled to federal habeas relief.

---

(c) Knowingly or willfully abuses a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child.

A person who commits aggravated child abuse commits a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(Doc. 18, Ex. Z). Fla. Stat. § 827.03 (1999).

Case No: 5:08cv253/RS/EMT

For the aforementioned reasons, it is **ORDERED**:

1.      Petitioner's motion to expand the record (Doc. 20) is **GRANTED**.

2.      Pursuant to Rule 5.2(d) of the Federal Rules of Civil Procedure, the clerk of court shall seal the materials submitted as exhibits to the motion to expand the record.

And it is respectfully **RECOMMENDED**:

1.      That Petitioner's Motion to Amend (Doc. 26) be **DENIED**.

2.      That the federal habeas petition (Doc. 1) be **DENIED**.

At Pensacola, Florida this 17th day of September 2009.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**